## MILLER *v.* THE STATE.

1. The court did not abuse its discretion in refusing to reopen the case and to admit evidence offered by the accused to show that the deceased was a man of violent character, this evidence having been offered after the State and the defendant had closed and the State had offered evidence in rebuttal of the defendant's evidence, and not being in rebuttal of any new matter brought out by the State.

2. In view of all of the facts appearing on the trial, this court is not reasonably convinced that on another trial there would probably be a different verdict because of the alleged newly discovered evidence.

3. Error is assigned on the refusal of the court to rule out the evidence of a witness for the State, as follows: "That a large crowd had gathered around the scene after the homicide had been committed and tried to prevent movant from leaving the scene together with officials of the street-car company." The criticism was that "it did not illustrate any issue in the case." This ground of the motion does not show error.

4. Error is assigned on the following instruction to the jury: "You are the judges of the law and the facts, and are to render a general verdict of guilty or not guilty." Movant complains that this charge was harmful to him, for the reason that "the charge in the indictment was that of murder and limited the jury to the consideration of this crime alone; whereas, under the evidence and the law, the crime of voluntary manslaughter was involved." The court fully and fairly instructed the jury in regard to the law of voluntary manslaughter, and explained that under a certain state of facts, if believed by the jury, a verdict finding the defendant guilty of voluntary manslaughter would be authorized. The exception in this ground of the motion is therefore without merit.

5. Complaint is made that the court erred in a lengthy instruction to the jury regarding the manner of selecting jurors by jury commissioners; how they were drawn for service in the court; that they were not volunteers, but had been drafted for public service to their country as soldiers are drafted for their country's defense; that jury trial is the sheet-anchor of American liberty, has stood the test and strain of a thousand years, and has come down to us from our Anglo-Saxon fathers across the seas; stressing the importance of honesty and uprightness in all relations of life, the duty resting upon them to measure up to these high principles, the sanctity of their oaths as to the questions that were propounded to them on the voir dire, and the oath administered upon being sworn to try the case, etc. The criticism is "that this portion of the charge was harmful to him, because it was

argumentative and calculated to unduly influence the minds of impartial jurors." While subject to some criticism, at least that it was not indispensable to the issues of the case, we cannot say that the charge contained any misstatements of the law, or untruths, or misconceptions in regard to the moral principles under discussion. We do not think it subject to the specific criticism made by movant, and therefore it will not require a reversal of the judgment refusing a new trial.

6. Several of the grounds of the motion for new trial complain of the instructions of the court in regard to the law of voluntary manslaughter. After a careful consideration of these grounds we are satisfied that they contain in substance a fair statement of the law on that subject, and that no error is shown. It would conserve no useful purpose to set out these grounds in full. since no new or novel question is raised. Suffice it to say that the chief criticism is that thereby the accused was deprived of his defense of justification based on the ground of reasonable fears. The jury was fully instructed in regard to the law of reasonable fears, as provided in the Penal Code, § 71.

7. Movant insists that the court erred in instructing the jury as follows: "The fact that a pistol, held in the hands of the prisoner at the bar, aimed at and towards the deceased, from which bullets were shot, penetrating his body and causing a wound from which he soon thereafter died, is not in fair debate in this case. The pistol was held by him. and its trigger pulled by. him, and the man is dead as a consequence." Under a fair construction of all of the evidence and the prisoner's statement, we think these facts are undisputed, and therefore the statement of them by the court was not error. ATKINSON, J., dissents.

8. The remaining grounds of the motion are either expressly abandoned, or are without merit. and therefore show no cause for the grant of a new trial. The evidence authorized the verdict.

No. 2594. JULY 13, 1921.

Indictment for murder. Before Judge Henry C. Hammond. Fulton superior court. March 28, 1921.

*Cobb & Foster,* for plaintiff in error.

*R. A. Denny,* attorney-general, *John A. Boykin,* solicitor-general, *Graham Wright,* and *E. A. Stephens,* contra.

GILBERT, J. 1. Evidence was introduced by the State for the purpose of showing the killing by the accused as alleged in the indictment, and the circumstances attending the same; whereupon the State closed its case. The accused then offered evidence, and made his statement, contending that the same showed a justification for the killing. The State then introduced a witness, Manning, in rebuttal, and on cross-examination by counsel for the accused he testified as follows: "I have known Bussey approximately four or five years. I know his general character for peacefulness and violence; he was always a peaceful boy. I never saw him in an argument in my life; he didn't drink whisky, that I know of; he wasn't drinking on this occasion, that I know of." The State again

closed its case; whereupon the accused called in his own behalf a witness, D. R. Sewell, and through his counsel propounded the following question: "Do you know his [F. S. Bussey's] general reputation?" The court refused to allow the witness to answer the question, making the following statement: "The State has put in its case and closed. You put in your case and closed the evidence. It is true that I permitted you to ask the witnesses who were on the cross-examination, called in rebuttal, that question. This is a matter of general defense; there is nothing suggestive of rebuttal in it; and to bring in this question at the end of the case doesn't quite seem to be proper, and I'll not admit it." Counsel for the accused then said: "Our reply is that we hadn't an opportunity to ask this witness such a question." Error is assigned on the refusal of the court to allow the witness to answer the question propounded, and in this assignment the following criticism is made: "Movant insisting that the witness, if permitted to answer, would answer as follows: that ' the reputation of F. S. Bussey for violence was bad, that he was of violent temper and frequently engaged in fussing and fighting.' Movant shows that this testimony was in rebuttal to that of the State's witness, W. L. Manning, who testified that he had known the said Bussey approximately four or five years, and that he knew his general character for peacefulness and violence, and that he was always a peaceful boy; and that the judge was then and there informed as to what the answer of the witness D. R. Sewell would be if he had allowed him to answer at all." Assuming, without deciding, that this evidence would have been admissible if offered at the proper time, it was not reversible error to refuse to allow the evidence at the time and under the circumstances detailed above. It was not in response to any new fact brought out by the State in its rebuttal evidence. To permit the defendant, on cross-examination of the State's witness introduced in rebuttal, to bring out new and independent facts not sought by the State, but in response to questions by counsel for the accused, and then to require a reopening of the case to allow defendant to rebut such evidence brought out by him, would be to put it within the power of the latter to arbitrarily prolong the case. Moreover, it would require the court to permit the State thereafter to again open its case for the introduction of further testimony, if obtainable, to meet the new issue thus raised. Had the State brought out in re-

buttal new evidence material to the issue, this, of course, would entitle the defendant to an opportunity, if desired, to explain, contradict, or disprove it. It is a well-recognized principle that the trial judge has a large discretion in regard to reopening a case for the introduction of new evidence after both parties have closed their case. In this instance there was no abuse of discretion.

2. One ground of the motion for new trial was based on alleged newly discovered evidence. The affidavit of the newly found witness, in so far as material to the present consideration, is as follows: " That on the evening of December 17th, 1920, that he boarded an Irwin Street car at the corner of North Pryor and Houston street at about six o'clock, his destination being the Atlanta Stove Works, which is situated on said car line at the corner of Irwin and Krog streets; that when said car reached the corner of Houston and Courtland streets that it stopped; that there was an automobile parked on Houston street at the corner of Courtland, and there was several people congregated around this car; the motorman who was driving the car on which I was riding got off of his car and went back to where the crowd around the automobile was standing. I heard the driver of the automobile, whom I afterwards learned was Bussey, order the motorman, whom I afterwards learned to be Miller, to go back to his car. Miller replied that he would go back when he got good and ready. I heard some man tell Bussey to go on and get in his car and go on away; just as Bussey got one foot on the running-board of his car he turned to Miller and said you God damn son of a bitch I will get you yet; with that Miller ran to Bussey and they grappled. Bussey got Miller down over the radiator of his car. I saw Bussey throw a knife to the ground and reach into his hip-pocket, when he did that Miller shot him twice. I left the car and went up to within fifteen feet of the fight, and plainly heard what happened." The only new fact is that the witness saw the deceased " throw a knife to the ground." Applications for new trials on account of newly discovered evidence are not favored by the courts. This well-known rule was forcefully and elaborately stated in the case of *Berry* v. *State,* 10 *Ga.* 512, 527. In the opinion the essential facts to be established are stated and many authorities are cited. The rule was restated in *Young* v. *State,* 56 *Ga.* 403, where, after stressing the necessity for great caution in the grant of new trials

on the ground of newly discovered evidence, it was said: "Courts are not obliged to grant a new trial for newly discovered evidence, unless they are reasonably convinced that on another trial there would probably be a different verdict." These principles have been adhered to by this court without deviation. In order to weigh the importance of the newly discovered evidence it is necessary to consider the evidence and the statement of the accused had upon the trial. The evidence developed on the trial showed that a collision occurred between a street-car and an automobile which Bussey, the deceased, was driving, and that when another street-car, operated by the defendant as motorman, approached the scene of the collision, the defendant got off his car, and went around one or two other street-cars which were standing between his car and the street-car which had collided with the automobile, for the purpose, as he claimed, of assisting in the investigation of the accident; and that the difficulty between the deceased and the defendant then arose, and the shooting followed. That the accused shot and killed Bussey is fully established by the evidence for the defendant, as well as that of the State. The defendant introduced more than one witness who swore to facts substantially in accord with the witnesses for the State, showing these facts beyond controversy. There was conflict only in regard to who brought on the difficulty. The witnesses for the State testified, in substance, that the defendant brought on the difficulty by using vile and profane epithets to the deceased, and when the deceased resented them the accused struck him with his fist, and when the deceased, without a weapon, had engaged the accused in the fight, the accused drew his pistol which had been concealed on his person, and shot the deceased. The witnesses for the defendant in the main testified that the deceased brought on the difficulty by the use of vile and profane epithets to the accused, and when the accused retorted by similar expressions the deceased assaulted and beat the accused with his fist, and during the fight the accused drew his pistol and shot the deceased. The accused, in his statement, detailed the facts as similar to those stated by the witnesses introduced by him. He also said, among other things, as follows: "Just as I got up there, this crew got his number; it was leaving, and I turned around, and just as I turned around Bussey came running up to me cursing me, says, 'You get

out from around here, get out,' . . . he says, ' Well, you little con-
sumptive you, I'll spill you all over the street,' and made a threat-
ening motion towards his pocket, which I took to mean that he
was fixing to pull out a gun. Well, I put my hand in my over-
coat pocket where I kept mine. Now, this car line, where I run
on, goes through West Fair, Chestnut Street, clean to Lee Street;
almost to West End Ave., there is nothing out there but negroes,
and they have trouble — we street-car men. I never had any to
amount to anything with any of these people, but going out Ir-
win Street we go through a dense negro populated settlement, and
I put this in my overcoat pocket, where I can get it; if a man has
one where he can't get it, he might as well not have it, the way
I always figured it. If you are going to have it, have it where
you can get it. And when he began to talk about making me sell
out and run from him and one thing and another, I just kinder
stood my ground. I didn't want him to have the satisfaction of
running me away from up there. I went up there, perfectly
legitimate work for me to go up there on. I thought the distance
this car was from the automobile, he had went that distance since
he had hit him, it would have been a bad accident." Nowhere in
the evidence either for the State or for the accused, or in the
statement of the accused, does it appear that the accused killed
or claimed to have killed the deceased in defending himself against
the use of a knife by the deceased, or the fear that the deceased
would use a knife. It appears without contradiction that the
deceased, in the presence of all, had emptied his front pants pocket
and had assured the deceased that he was unarmed, without even
a pocket-knife, and asked him to fight it out in their shirt sleeves,
without weapons, in a fair manner. The alleged newly discov-
ered testimony shows, if anything, that the deceased intentionally
discarded the knife and refused to use it. The accused inter-
posed the defense that the deceased reached toward his hip-pocket,
and, acting under the fears of a reasonable man that he was
about to draw a pistol, he shot him in his own defense. After a
careful consideration of all the facts adduced upon the trial, we
are unable to see any reason for the grant of a new trial because
of the alleged newly discovered evidence. If a new trial should
be granted and the newly discovered evidence should be introduced,
it would require a considerable strain of the imagination to con-

ceive of a different verdict in the case on that ground. This is especially true when we consider that part of the statement of the accused quoted above. It is established out of his own mouth that he habitually carried a pistol in the performance of his duty as a motorman on the trolley-car where he was employed. Thus he establishes for himself that he belonged to that class of persons who believe it necessary for self-protection to daily carry upon his person a dangerous and deadly weapon in the handling of his passengers. He offered no explanation for this, save that his car traversed a " dense negro populated settlement," and " they have trouble — we street-car men." This amounts to no excuse whatever. If on the contrary it justifies a conductor or motorman on a street-car to carry a pistol contrary to the law of the land, citizens otherwise law-abiding are likely to conclude that they must, in traveling on street-cars, go armed for self-protection. Furthermore, according to his own words, as quoted above, and as showing his trend of mind, he says: " I put this [the pistol] in my overcoat pocket, where I can get it; if a man has one where he can't get it, he might as well not have it, the way I always figured it. If you are going to have it, have it where you can get it." For one entertaining these views nothing is more natural than for his mind unnecessarily and altogether too quickly to arrive at the conclusion that the other man is about to draw a weapon whenever his hand goes toward a pocket. The fact that the accused habitually was armed when on duty challenges the quality of his courage and the claim that he killed under the fears of a reasonably courageous man. The absolute inadequacy and futility of such justification, standing alone, is shown by Chief Justice Warner in the case of *Malone* v. *State,* 49 *Ga.* 210, 218. There the killing of one who threw his hand to his hip-pocket, and under the provocation of vile epithets, was denounced as murder. See also *Vernon* v. *State,* 146 *Ga.* 709, 715 (92 S. E. 76).

3. The third, fourth, fifth, sixth, seventh, and eighth headnotes do not require elaboration.

        *Judgment affirmed. All the Justices concur, except*

Atkinson, J., who dissents from the ruling in the seventh headnote.